FARRIS *et al. v.* MAGONE.

*(Circuit Court, S. D. New York.* April, 1891.)

CUSTOMS DUTIES—CLASSIFICATION—REMELTING STEEL.

A metal imported from Sweden, being in the form of cakes or slabs from 24 to 30 inches in length by 12 to 14 inches in width, and from an inch to an inch and a half thick, with the upper surface nicked into rectangular or oblique angular "caramels," about an inch and a quarter square, invoiced as "remelting steel in cakes," was classified for duty by the collector of the port of New York as "steel in slabs, forty-five per cent. *ad valorem*," under Schedule C of the tariff act of March 3, 1883 (Heyl's Tariff Ind., New, 177, 183,) which classification was sustained in this case by the jury finding a verdict in favor of the defendant, collector.

At Law.

Action by the plaintiffs, importers, to recover duties alleged to have been illegally exacted by the defendant, collector of the port of New York. The merchandise involved in the present suit was imported by the plaintiffs from Sandviken, Sweden, and entered at the port of New York, February 10, 1888. The invoice described the metal as "remelting steel in cakes; nicked rectangular; nicked oblique angular;" and the defendant, then the collector of customs at said port, classified the same for duty as "steel in slabs, #23, forty-five per cent. *ad valorem*," under the provision in Schedule C of the tariff act of March 3, 1883, (Tariff Ind., New, par. 177,) for "steel ingots, cogged ingots, blooms and slabs, by whatever process made." Against this classification the plaintiffs duly protested, claiming that the merchandise was a metal compounded of iron, carbon, and other elements, and was dutiable under Schedule C of said tariff act—"*First*, as unwrought metal at twenty per cent. *ad valorem;* or, *second*, at three-tenths cent per pound by similitude to pig-iron, spiegeleisen, wrought and cast scrap-iron, and scrap-steel; or, *third*, it should not pay above thirty-five per cent. under the provision for iron in slabs,

blooms, loops, etc.; it is used only for making steel; it is not malleable, nor wrought." The importers duly appealed to the secretary of the treasury, who affirmed the decision of the collector; and this action was brought, within the time prescribed by law, to recover the alleged over-payment of duties.

On the trial the plaintiffs offered testimony showing that the metal was a product made in Sandviken, Sweden, from six or seven kinds of Swedish iron ores, which were charged in a furnace in alternate layers with charcoal mixed with coke; that gas fuel was introduced into the furnace through a conduit; that to the compound were added other elements, which were a secret with the manufacturers; that when the metal was in a semi-molten state it was run out upon an iron floor; that when partially cooled it was removed in irregular masses, and placed under a steel "former," an instrument resembling a waffle-iron, and operated by hydraulic press, which stamped the upper surface into rectangular or oblique-angular "caramels" about an inch and a quarter square; that the product was then in cakes 24 to 30 inches in length by 12 or 14 inches in breadth, and from an inch to an inch and a half thick, in which condition it was imported; that it was sold in this country as "remelting steel" or cake metal. Plaintiffs further introduced testimony that the metal was used for remelting in the manufacture of crucible steel,—35 pounds of it in a crucible with other materials to produce 90 pounds of steel,—and that it was suitable for no other purpose than to be broken up and remelted. Samples were produced in court by plaintiffs' witnesses, indicating that the metal was incapable of being forged; that it appeared to burn up in the fire; that, subjected to the process of rolling in a rolling-mill, the metal flattened out, but did not strictly roll. The witness offering this testimony admitted, on cross-examination, that the metal was not hammered before being put into the rolls, which was the usual process in rolling high carbon steels. Plaintiffs' witnesses also admitted that no chemical analysis of the metal had been made by or furnished to them, and that the specimens were treated without reference to the chemical characteristics of the metal operated upon. In behalf of the defendant, the testimony of an expert chemist was introduced showing that analyses of two samples of the plaintiffs' importation gave the following results:

|                            | First Sample. | Second Sample. |
|----------------------------|---------------|----------------|
| Combined carbon,           | 1.095%        | 1.261%         |
| Silicon,                   | 0.059         | 0.049          |
| Sulphur,                   | 0.038         | 0.011          |
| Phosphorus,                | 0.053         | 0.034          |
| Manganese,                 | 0.454         | 0.469          |
| Iron, (by difference,)     | 98.301        | 98.176         |
|                            | 100.000       | 100.000        |

A practical expert and mechanical engineer testified in behalf of the defendant that in cast-irons the carbon, in a free or graphitic condition, ranged between 3 and 5 per cent. and even higher; that, in steels pro-

duced from ores by a direct process, the carbon was found in a combined form, running in the case of hard steels as high as 2 per cent., and in very mild steels as low as two-tenths of 1 per cent.; that there was a middle ground covered by the "steely irons," which ran from about seven-tenths of 1 per cent. in carbon down to two-tenths; that below two-tenths of 1 per cent of carbon, the metal, under the action of heat, assumed a fibrous structure, and became wrought-iron; that certain grades of cast iron would permit of "hardening" or "chilling," but would not take the different colors, nor the different degrees of hardness, indicated by the "temper" of steel; that some wrought-irons would take the temper colors, but would not assume the different degrees of hardness indicated by these colors, and that steel alone was capable of assuming all the various colors of temper and degrees of hardness; that the term "cast" signified a metal run out in a molten or semi-molten state, and that the plaintiffs' metal showed every evidence of having been cast; that this Swedish product was of a coarse granular structure, and in the process of forging and working attained a very fine granular structure, as shown by high carbon steels. This witness also proved by test pieces produced from a sample of plaintiffs' merchandise, and offered in evidence, that the metal forged well into a bar; that this bar, when fractured, showed the fine granular structure of steel; that the temper test of this bar by the usual method in such cases showed all the degrees of temper by color and the various degrees of hardness; that a so-called "side-tool" was made by the witness out of one of the test pieces of the metal, and that this "side-tool" cut a piece of hard tool steel in a lathe, the tool not even turning its edge. It was also shown by this witness that the chemical analysis (of second sample, as above given) made of the metal before his forging tests indicated a high carbon hard steel, and that an analysis made after the forging showed that the metal had not changed its character by the heat and working, except to lose a small fraction percentage of carbon, and was, both before and after the forging tests, of the quality of high tool steel. The defendant also produced the testimony of a practical blacksmith from one of the leading iron and steel works in New York city, formerly employed in the United States navy-yard at Brooklyn, who testified that he heated a sample of plaintiffs' metal (being first sample of which the analysis is given above) in an ordinary blacksmith's forge; that it was malleable, and forged easily and well; that the piece so forged was tempered by him in the usual manner, by plunging into water, and then drawing the temper by a slow fire, showing all the temper colors; and that, in the opinion of the witness, the metal was steel suitable for tools. A number of experts in the manufacture of steel, in answer to a hypothetical question by defendant's counsel covering the facts as proved by defendant's other witnesses, testified that the metal was steel. At the close of the testimony, both sides having rested, the assistant United States attorney, on behalf of the defendant, moved the court to direct a verdict in favor of the defendant, upon the ground that the metal imported was either steel, according to the tests and evidence produced by the defendant, or it was iron in

the manufacture of which charcoal was used as fuel, and the duty provided by paragraph 148 of Schedule C of the tariff act of March 3, 1883, upon such iron, was $22 per ton, which duty was higher than the 45 per cent. rate imposed by the defendant collector in this case, and could therefore be availed of by him as a defense to this suit. This motion was denied by the court, and the defendant's counsel duly excepted.

*Hartley & Coleman*, for plaintiffs.

*Edward Mitchell*, U. S. Atty., and *James T. Van Rensselaer*, Asst. U. S. Atty., for defendant.

LACOMBE, Circuit Judge, *(charging jury.)* The first question for you to determine is whether charcoal was used as fuel in the manufacture of the imported product which is the subject of this suit; and, if so, whether this product, thus manufactured with charcoal, is iron. If it is, your verdict must be for the defendant; for there is a special rate of duty provided for all iron, of any shape or form, manufactured by the use of charcoal as a fuel, and the rate of duty fixed for such iron is higher even than the rate of duty which the plaintiffs paid here. If you come to the conclusion that charcoal was not used as a fuel in the manufacture of this article, the next question for you to answer is this: What is it,—iron or steel?

The collector classed it as steel, and charged it with 45 per cent. duty. It is the presumption of law that the acts of a public officer are done in accordance with his duty. That is the presumption with which you begin this case,—that the collector's classification is the right one; and it is for the plaintiffs to satisfy you by fair preponderance of proof that the collector was mistaken. That is a burden which the law throws upon the plaintiffs. We start, then, with the presumption that the collector correctly classed it as steel.

In the tariff act congress has very carefully provided for a duty on all varieties of steel,—for steel in all its various shapes and forms. In the first place, in one paragraph, (177,) it enumerates a very great many varieties of steel. I will not repeat the list. I included nearly all the articles named in it in the question which I put to Mr. Parsons, when I asked him if all the articles enumerated in that question were malleable; among them appear "steel ingots," "steel blooms," and "steel slabs, by whatever process made." Having thus provided for a great number of named varieties of steel, congress then, in order that no steel might escape, by paragraph 183 provided that "steel, not specially enumerated or provided for in this act," should pay 45 per centum *ad valorem.* That is the same rate which was laid upon steel blooms, ingots, slabs, and the other varieties of steel enumerated in the former paragraph, (No. 177.) Congress has also been very considerate towards the collectors and the jurymen who have to answer the question, "What is steel?" (which to you, gentlemen, in view of the testimony we have had here, may perhaps seem no easy task.) It has given a definition of "steel" in the very paragraph which provides for a duty on all steel not specially enumerated. It there defines steel as all metal produced from iron or its ores, of whatever de-

scription or form, without regard to the percentage of carbon contained therein, or the particular process of manufacture, either granular or fibrous in structure, which is cast, and which is malleable. All such metal, congress declares by the tariff act, shall be classed, for duty purposes, as steel.

Now, let us look again at this definition, bearing in mind the question we have to answer,—whether this article is iron or steel,—and see how much of it is established by the proof without any dispute, and how much of it is to be settled by you on the testimony. "All metal produced from iron or its ores:" Concededly this article is a metal which was produced from iron or its ore. "Of whatever description or form, without regard to the percentage of carbon contained therein, or the process of manufacture:" That eliminates from your consideration any concern as to the particular variety, or the process by which it is made, or as to the particular amount of carbon which it may contain. "Granular or fibrous in structure:" I do not understand that there is practically any contradictory testimony as to the fact that this article is granular in structure. The plaintiff himself testified that it was partly granular, partly fibrous, and partly nodular; one, certainly, and I think two, of his witnesses testified that it was coarsely granular; while each witness for the defense to whom the question was put testified, I think without exception, that it was granular. That it is either granular or fibrous, I think, under the testimony, admits of no doubt. Thus far in the definition, then, you will see that there is no particular dispute; that it is a metal produced from iron or its ores; of proper shape; granular or fibrous in structure. "Which is cast and which is malleable:" You are to determine, from the testimony of the plaintiff as to the way in which this article is produced from the ores, and from what you have heard from the other witnesses as to what the word "casting" means in the steel and iron trade, whether or not this metal has been "cast." You are also to determine from the testimony whether this article is practically, commercially, "malleable," under the testimony that has been given to you. "Malleable" is defined as "capable of being drawn out and extended by beating; capable of extension by hammering; reducible to laminated form by beating." If, under the testimony, you reach the conclusion that this article is "cast," and that it is practically and commercially "malleable" it is then, under the definition which congress has given, "steel," and your verdict must be for the defendant. Should you reach the conclusion, however, either that it is not "cast," or that it is not practically and commercially "malleable," then, under the testimony, there seems no escape from the proposition that it is "iron;" and, if so, it would be dutiable under paragraph 148, as "iron in slabs," at not less than 35 per cent., in which case your verdict would be for the plaintiffs for $293.27.

*Mr. Hartley.* I except to the refusal to give my charge with regard to wrought-iron; and I also ask the court to charge that the use of charcoal as a carbonizer—to furnish carbon to the ores—is not its use as a fuel.

*Lacombe, J.* Yes; if the charcoal which was put in the furnace was put in for the purpose and accomplished the object of combining itself with the other materials, and thus forming the ultimate product, then the charcoal was not used as a fuel. If, however, it was put in simply with the object, by its own combustion, to promote the liquefaction and union of the other elements which were put in, then it was used as fuel.

The jury rendered a verdict for the defendant.